UNITED STATES OF AMERICA
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:14CR194 (AWT) |
| v. | |
| GARRETT SANTILLO | DATE: July 9, 2016 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with defendant Garret Santillo's ("Santillo" or "defendant") sentencing, which is currently scheduled for August 2, 2016.

I.   **Factual Background**

On July 15, 2014, United States District Judge R.N.C. received a letter at his residence via the U.S. Postal Service that was postmarked on July 11, 2014, from Miami, Florida. Although the letter did not bear a return address, it was later determined that Santillo wrote and sent the letter.

In the letter, Santillo demanded that Judge R.N.C. issue a ruling vindicating James Van de Velde, who was named as a suspect in the 1998 murder of Suzanne Jovin, but was never charged with the crime. Santillo threatened, "You must tell Mr. Van de Velde you are issuing a written paper saying you are granting what he wanted you to do regarding this or we will most definitely kill you. You (sic) home addresses in Conn. are public information and if you mask your identity by name or appearance, we can still track you to wherever you go and will kill you if you don't follow what this letter instructs."

1

Following Judge R.N.C.'s receipt of the threatening letter, approximately 14 other individuals in Connecticut also received letters from Santillo that contained death threats. For example, on July 17, 2014, the Chief of the New Haven Police Department received a letter from Santillo threatening to kill the Chief if he did not solve the Jovin homicide. In the letter, Santillo also threatened to kill several other individuals who were in some manner associated with the Jovin homicide investigation, including a criminologist, the former president of Quinnipiac College, and the former president of Yale College.

Thereafter, Santillo wrote letters to all of the individuals referenced in the letter he sent to the NHPD Chief, wherein he threatened to kill them if they did not comply with his demands. For instance, on July 21, 2014, Santillo sent a letter to H.L. that demanded that H.L. solve and ensure that the "killers" in all cases with which H.L. has been involved, including Jon Benet Ramsey's murder, are incarcerated in "tough prisons." Santillo gave H.L. until December 31, 2017, to comply with his demands. If H.L. failed to do so, Santillo threatened that "you and others you know will be killed by ways no FBI or even God will be able to STOP!" Santillo continued, "Anyone who hides their identity in way of name, appearance or in some way – we will still find them and kill them, including you, [H.L.] and wife [M.L.] if you don't do all of this." H.L. informed investigators that he has received many threatening letters over the years, but that this one was particular frightening because it was sent to his home address and specifically referred to his wife by name.

Santillo also sent threatening letters to several other individuals who were involved in high profile cases. For instance, on July 21, 2014, Santillo sent a letter to J.P. at her home address that demanded that J.P. donate to charity $8 million of the $8.3 million that J.P. was

awarded in a sexual harassment law suit. Santillo threatened that if the donation was not made by the end of 2014 that J.P. would, "most definitely be slain (killed by us)…If you try to mask or change your identity by appearance, name or in any way, we will still find you + kill you by remote force." Like H.L., J.P. noted that in her former line of work, she had received threatening letters upon occasion. However, this one frightened her so much that she reported it to the police. Santillo also sent a threatening letter to the home address of another individual involved in the above-referenced sexual harassment law suit. In the letter, Santillo threatened to "severely painfully" harm the individual if he ever committed another "wrong."

On July 29, 2014, Santillo sent a letter to L.W.F. and B.F. who, at the time, were involved in a highly-publicized criminal trial. Santillo threatened that L.W.F. and B.F. must accept "5 Full years in Federal Prison for all your current charges… or both you and [B.F.] and the Federal Judge [J.B.A.] will be painfully killed by remote ways." Santillo also threatened, "If any of you try changing your identity by name or physical appearance, you will still be found by us and killed!"

On the same day, Santillo sent a letter to J.R. threatening that J.R. must "accept a sentence of 6 full years in federal prison for your current 2014 charges and if the judge doesn't do this both you and [Federal Judge J.B.A.] will be painfully killed." Santillo threatened, "None of you are to change your identity by name, appearance or in any way because we will still find you all!"

In addition, on August 15, 2014, Santillo sent a letter to the Governor of Connecticut in which Santillo stated, "we have all your family's addresses and know your and their locations at all times from now on. [D.M.] will most definitely be killed for signing a bill ending the death

penalty in CT." Santillo also stated, in substance, that the death penalty must be imposed on the Cheshire Home Invasion murderers, amongst others criminals, by 2016 or "we will kill multiple people at random." In addition, Santillo said that he planned to kill the Judge who imposed the death penalty on the Cheshire defendants because he had not yet insisted that the death penalty be carried out.

Similarly, on August 15, 2014, Santillo sent a letter to D.R. and P.R., who are the parents of an individual who previously was convicted of murder. In the letter, Santillo threatened, "You will be killed [P.R.] for wrongfully abandoning the family and beating all of your children. That is wrong and unforgivable…If you try changing your identity [P.R.] by name, appearance or in any way we will still find you and kill you and never be caught."

Finally, Santillo sent several threatening letters to an employee of Yale New Haven Hospital, at his home address, and to the "President of Yale University." One of the letters to the employee included the threat, "You will be murdered for lying," because Santillo believed that the victim had failed to follow through with a promise to have another employee return a telephone call. In one of the letters to the President of Yale, Santillo ominously stated that he plans to "come to Connecticut once in a while to see that my promise here happens."

On September 29, 2014, members of the U.S. Marshals Service Fugitive Task Force, together with members of the Broward County Sheriff's Office, went to Santillo's residence in Hollywood, Florida, in an effort to execute a warrant for his arrest. Officers knocked on the defendant's door and, when they saw the defendant through the apartment window, advised him that they were there with a warrant for his arrest. Rather than open the front door, Santillo locked the deadbolt and refused multiple orders to open the door. While officers attempted to breach the

door, Santillo made a statement about killing himself and moved out of the officers' sight into another area of the apartment. Concerned that Santillo was arming himself, officers broke out a window and deployed a taser to prevent Santillo from harming himself or members of law enforcement. Nonetheless, as officers entered the apartment, Santillo continued to disobey commands and to resist arrest.

Eventually, Santillo was taken into custody. Following his arrest, Santillo waived his *Miranda* rights and, during an audio recorded statement, admitted writing the letters charged in the Indictment. He also identified his handwriting on each of the letters and envelopes he sent to Connecticut. Further, during a search of Santillo's residence, law enforcement recovered dozens of handwritten, threatening letters that were sealed in envelopes bearing no return address, including a letter addressed to President Obama in which Santillo threatened to kill the President.

## II.     Procedural Background

On September 23, 2014, a Grand Jury sitting in New Haven, Connecticut, returned a nine count indictment charging the defendant with seven counts of mailing threatening communications, in violation of Title 18, United States Code, Section 876(c), and two counts of impeding, intimidating, influencing, or retaliating against a United States Judge, in violation of Title 18, United States Code, Sections 115(a)(1)(B) and 115(b)(4).

On March 13, 2015, Santillo entered a guilty plea, pursuant to a plea agreement, to Count Two of the Indictment, which charged him with mailing threatening communications. The parties agreed in the plea agreement that: (1) the defendant's base offense level was 12; (2) two-levels would be added because the offense involved more than two threats; (3) six-levels would be added because the victim was an officer of the government; and (4) three levels would be

subtracted for acceptance of responsibility. This resulted in a total offense level of 17. Both parties agreed that the defendant fell within criminal history category III due to his two prior state convictions, respectively, for stalking and harassment and two prior federal convictions for sending threatening communications.

Based upon the fact that the defendant fell within criminal history category III, the parties agreed that the defendant's advisory Guidelines range was 30 to 37 months' imprisonment, up to three years' of supervised release, up to a $50,000 fine, a $100 special assessment, and restitution as ordered by the Court.

On July 2, 2015, the Probation Department issued a Presentence Report ("PSR") that accorded with the plea agreement with respect to the Guidelines calculation. PSR ¶¶ 20-30. However, the PSR concluded that the defendant fell within criminal history category II due to the fact that he only received criminal history points for one of his prior convictions. Accordingly, the PSR calculated the defendant's advisory Guidelines range to be 27 to 33 months' imprisonment, PSR ¶98; his fine range to be $5,000 to $50,000, PSR ¶ 105; and his supervised release range to be one to three years, PSR ¶ 100. While the defendant is statutorily eligible for a probationary term of up to five years, he is ineligible under the Guidelines because he is in Zone D of the sentencing table. PSR ¶¶ 101-02.

### III. Discussion

A sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d

103, 113 (2d Cir. 2005). In turn, 18 U.S.C. § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider:"

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2)    the need for the sentence imposed—
        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B)    to afford adequate deterrence to criminal conduct;
        (C)    to protect the public from further crimes of the defendant; and
        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3)    the kinds of sentences available;
    (4)    the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
    (5)    any pertinent policy statement [issued by the Sentencing Commission];
    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness, *see Rita v. United States*, 127 S. Ct. 2456, 2459 (2007), under a "deferential abuse-of-discretion standard," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

    A.    <u>The nature and circumstances of the offense</u>

The defendant's offense conduct was very serious because it was not only intended to, but succeeded in, instilling a great sense of fear in his victims. Many of Santillo's victims are high-profile individuals who had, throughout their careers, received threatening communications on several occasions. Nonetheless, Santillo's letters were particular disturbing because he sent the letters to the victims' home addresses threatening to kill the victims and, in some cases, their family members, who Santillo often referenced by name.

Despite the blatant nature of the threats, the defendant attempts to lessen the severity of his conduct by asserting that he does not pose a physical danger to others and has never attempted to act on any of the threatening communications. *See* Def. Memo at 16. That fact – which is debatable based upon the conduct associated with his state convictions – is irrelevant. The defendant's letters were alarming and their impact was felt upon receipt. Whether or not Santillo *actually* posed a physical threat to the victims does nothing to mitigate the emotional harm he inflicted on the victims.

B.     The defendant's history and characteristics

Santillo's history and characteristics are well-outlined in the PSR and in the defendant's sentencing memorandum. It is clear that both he and, as a consequence, his family have struggled with years of mental health difficulties that were not previously addressed in an effective manner. As a result, Santillo has continued to engage in threatening and harassing criminal conduct over the course of the last 15 years.

It appears, however, that Santillo's current course of treatment is appropriately addressing his psychological and social-cognitive challenges. His long-term stay at Connecticut Valley Hospital and subsequent placement at Continuum of Care have afforded Santillo the structure, supervision, and multi-disciplinary approach to treatment that are clearly needed to teach Santillo to interact with others in a pro-social manner.

The government agrees that imprisoning Santillo at this juncture would unnecessarily disrupt his treatment and, in all likelihood, undo any progress that he has made thus far. Such a result is neither beneficial for Santillo nor for the community. Accordingly, the government agrees with the treatment plan as outlined in the defense submission with two requested

adjustments. First, the government requests that the treatment plan be modified to clarify that Santillo's treating therapist and defense counsel will periodically review the content of Santillo's journal to check for problematic writings. Second, the government requests that, as a condition of release, the defendant be required to reside at Continuum of Care for the duration of his probation, and that Continuum of Care be required to immediately report any violation of this condition to Probation, such as if the defendant leaves the facility without permission for any reason or for any duration. With these two requested changes, the government believes that a downward departure to permit imposition of a five-year term of probation that includes all of the conditions outlined in the submitted treatment plan is the best means by which to protect the public and to provide Santillo with much-needed behavioral and mental health treatment.

        Respectfully submitted,

        DEIRDRE M. DALY
        UNITED STATES ATTORNEY

        /s/

        TRACY LEE DAYTON
        ASSISTANT UNITED STATES ATTORNEY
        Federal Bar No. phv02206
        United States Attorney's Office
        1000 Lafayette Blvd., 10th Floor
        Bridgeport, CT 06604
        (203) 696-3000

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 9, 2016, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/
_____
TRACY LEE DAYTON
ASSISTANT U.S. ATTORNEY